**Debra D. PRENOSIL, Plaintiff,**

v.

**Michael J. ASTRUE, Commissioner of Social Security, Defendant.**

No. C07–0020.

United States District Court,
N.D. Iowa,
Cedar Rapids Division.

Jan. 31, 2008.

Jeffrey P. Berg, Cedar Rapids, IA, Thomas A. Krause, West Des Moines, IA, for Plaintiff.

Lawrence D. Kudej, U.S. Attorney's Office, Cedar Rapids, IA, for Defendant.

**RULING ON JUDICIAL REVIEW**

JON STUART SCOLES, United States Magistrate Judge.

## TABLE OF CONTENTS

I. *INTRODUCTION* ...................................................1047

II. *PRIOR PROCEEDINGS*...........................................1047

III. *PRINCIPLES OF REVIEW*.........................................1048

IV. *FACTS* ...........................................................1048
   A. *Prenosil's Education and Employment Background* ...................1048
   B. *Administrative Hearing Testimony* ...................................1049
      1. *Prenosil's Testimony* .............................................1049

    2.   *Tonya Nelson's Testimony* ........................................1050
    3.   *Vocational Expert's Testimony* ...............................1050
  C.   *Prenosil's Medical History* ......................................1051

V.  *CONCLUSIONS OF LAW* .........................................1056
  A.   *ALJ's Disability Determination* .................................1056
  B.   *Whether the ALJ's Disability Determination is Supported by*
     *Substantial Evidence* ..........................................1057
    1.   *Dr. Eggerman's Opinions* ...................................1057
    2.   *Tonya Nelson's Testimony* ...................................1060
    3.   *Evidence from the DVRS* ....................................1061
    4.   *Credibility of Prenosil's Testimony* ..........................1062

VI.  *CONCLUSION* .................................................1063

VII.  *ORDER* .....................................................1063

## I. INTRODUCTION

This matter comes before the Court on the Complaint (docket number 3) filed by Plaintiff Debra D. Prenosil on February 28, 2007, requesting judicial review of the Social Security Commissioner's decision to deny her application for Title II disability insurance benefits and Title XVI supplemental security income ("SSI") benefits. Prenosil asks the Court to reverse the decision of the Social Security Commissioner ("Commissioner") and order the Commissioner to provide her disability insurance benefits and SSI benefits. In the alternative, Prenosil requests the Court to remand this matter for further proceedings.

## II. PRIOR PROCEEDINGS

Prenosil applied for disability insurance benefits and SSI benefits on June 25, 2004.[1] In her application, Prenosil alleged an inability to work since April 30, 2003 due to major depression, an anxiety disorder, a personality disorder, and obesity. Prenosil's applications were denied on October 11, 2004. On February 8, 2005, her applications for disability insurance benefits and SSI benefits were denied on re-

consideration. On March 7, 2005, Prenosil requested an administrative hearing before an Administrative Law Judge ("ALJ"). On November 10, 2005, Prenosil appeared with counsel, via video conference, before ALJ Andrew T. Palestini for an evidentiary hearing. Prenosil, Tonya Nelson, Prenosil's case manager at the Abbe Center for Community Mental Health ("Abbe Center") in Cedar Rapids, Iowa, and vocational expert Marian Jacobs testified at the hearing. In a decision dated June 19, 2006, the ALJ denied Prenosil's claim. The ALJ determined that Prenosil was not disabled and was not entitled to disability insurance benefits or SSI benefits because she was functionally capable of performing her past relevant work. Prenosil appealed the ALJ's decision. On January 13, 2007, the Appeals Council denied Prenosil's request for review. Consequently, the ALJ's June 19, 2006 decision was adopted as the Commissioner's final decision.

On February 28, 2007, Prenosil filed this action for judicial review. The Commissioner filed an answer on June 4, 2007. On August 9, 2007, Prenosil filed a brief arguing there is not substantial evidence in the record to support the ALJ's finding

---

1. The record indicates that Prenosil also filed an application for disability insurance benefits on July 22, 2003. Prenosil's application was denied on November 25, 2003. Neither Prenosil's Complaint, nor the ALJ's decision, however, mentions this filing.

that she is not disabled and that she able to perform her past relevant work. On October 5, 2007, the Commissioner filed a responsive brief arguing the ALJ's decision was correct and asking the Court to affirm the ALJ's decision. On April 20, 2007, both parties consented to proceed before the undersigned in this matter pursuant to the provisions set forth in 28 U.S.C. § 636(c).

## III. PRINCIPLES OF REVIEW

Title 42, United States Code, Section 405(g) provides that the Commissioner's final determination following an administrative hearing not to award disability insurance benefits is subject to judicial review. 42 U.S.C. § 405(g). Pursuant to 42 U.S.C. § 1383(c)(3), the Commissioner's final determination after an administrative hearing not to award SSI benefits is subject to judicial review to the same extent as provided in 42 U.S.C. § 405(g). 42 U.S.C. § 1383(c)(3). 42 U.S.C. § 405(g) provides the Court with the power to: "[E]nter ... a judgment affirming, modifying, or reversing the decision of the Commissioner ... with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). "The findings of the Commissioner ... as to any fact, if supported by substantial evidence, shall be conclusive ..." *Id.*

The Court must consider "whether the ALJ's decision is supported by substantial evidence on the record as a whole." *Vester v. Barnhart,* 416 F.3d 886, 889 (8th Cir.2005) (citing *Harris v. Barnhart,* 356 F.3d 926, 928 (8th Cir.2004)). Evidence is "substantial evidence" if a reasonable person would find it adequate to support the ALJ's determination. *Id.* (citing *Sultan v. Barnhart,* 368 F.3d 857, 862 (8th Cir. 2004)). Furthermore, "[s]ubstantial evidence is 'something less than the weight of the evidence, and the possibility of draw-

ing two inconsistent conclusions does not prevent an administrative agency's findings from being supported by substantial evidence.'" *Baldwin v. Barnhart,* 349 F.3d 549, 555 (8th Cir.2003) (quoting *Cruse v. Bowen,* 867 F.2d 1183, 1184 (8th Cir.1989), in turn quoting *Consolo v. Fed. Mar. Comm'n,* 383 U.S. 607, 620, 86 S.Ct. 1018, 16 L.Ed.2d 131 (1966)).

In determining whether the ALJ's decision meets this standard, the Court considers "all of the evidence that was before the ALJ, but it [does] not re-weigh the evidence." *Vester,* 416 F.3d at 889 (citing *Guilliams v. Barnhart,* 393 F.3d 798, 801 (8th Cir.2005)). The Court not only considers the evidence which supports the ALJ's decision, but also the evidence that detracts from his or her decision. *Guilliams,* 393 F.3d at 801. "[E]ven if inconsistent conclusions may be drawn from the evidence, the agency's decision will be upheld if it is supported by substantial evidence on the record as a whole." *Id.* (citing *Chamberlain v. Shalala,* 47 F.3d 1489, 1493 (8th Cir.1995)).

## IV. FACTS

### A. Prenosil's Education and Employment Background

Prenosil was born in 1955. She graduated from high school and has certified nurse aide training and med-tech training. She was employed by Lason Services, Inc. ("Lason"), formerly known as Crest Information Technologies, Inc., from 1984 to 2003. Prenosil was laid off and later relieved of her position when Lason closed its business in March, 2003. She received unemployment benefits following the loss of her job. In January, 2004, Prenosil was referred to the Iowa Division of Vocational Rehabilitation Services ("DVRS") by Iowa Workforce Development. Prenosil sought assistance from DVRS in finding a job that would utilize her skills as Lab Technician.

She informed DVRS that she needed a low stress work environment because she suffered from depression and a severe anxiety disorder. Prenosil worked with DVRS between January, 2004 and November, 2004. In September, 2004, Prenosil was offered a job in the mail room at Ruffalo Cody. She declined the position because she felt that she wasn't physically or emotionally capable of performing the job. On October 5, 2004, DVRS placed Prenosil in "Interrupted Status" because Prenosil wanted to get her health stable before pursuing further employment. Prenosil has no record of earnings for 2004 or 2005.

### B. Administrative Hearing Testimony

#### 1. Prenosil's Testimony

At the November 10, 2005 administrative hearing, Prenosil was questioned by her attorney about her reasons for filing an application for disability benefits. Prenosil and her attorney had the following exchange:

Q: Okay, well, what happened that you filed for disability?

A: I was called into [sic] Job Service for some sort of pool that I had won for the person most likely, one of the people most likely to be re-employed, and when I went to that conference with the gal she proceeded to ask me about my tremors, my voice changes, and just my all over body tremors she was quite concerned about. She felt that I needed to be looked into further. I, there was not a health risk that she felt there might be something wrong. She then referred me to Ann [Alliger] through vocational rehabilitation. She felt that my tremors and my voice and my all over

body language was hampering me from getting re-employment.

(Administrative Record at 458–59) Prenosil also discussed her marijuana and meth drug use at the hearing:

Q: I have to bring this up because it [is] obvious from your file [that] there is some issue about marijuana and meth use recently.

A: Actually it was not recently, it was I would say the end of April, the first part of May was the last time—

Q: Of this year?

A: Yes.

Q: Okay.

A: Yes. At that time through working with the people at [the Abbe Center] it was brought to my attention that we needed to take a look at that situation and I was able to take a look at the situation and just discontinue the use.

Q: Okay, what got you going on it in the first place?

A: I believe in my heart after what I have learned about myself and about my personality disorder, I believe it was a self medication situation for the amount of personal and emotional anguish I go through at times and I have a chronic pain level too from some things; past work injuries, fibromyalgia, that it becomes very, very difficult for me at times.

Q: So, was it more of an escape do you think?

A: Yes.

(Administrative Record at 466) In regard to her physical health, Prenosil testified that she suffers from chronic pain and fibromyalgia.[2] She claims that there are

---

2. According to the record, the ALJ did not find that Prenosil was impaired by fibromyal-

gia. This finding is not disputed by Prenosil

times when the pain is so bad, that she is unable to walk in the morning when she gets out of bed. She also stated that her pain level is an eight on a scale of one to ten. Prenosil testified that on a typical day, she gets up and tries to do things around the house and also tries to leave the house once per day; however, she is limited in her ability to do these things because of her chronic pain. She further testified that she cooks for herself and cleans her house. She receives help in grocery shopping from her community support person at the Abbe Center.

### 2. *Tonya Nelson's Testimony*

Tonya Nelson ("Nelson") is Prenosil's case manager at the Abbe Center. Nelson began working with Prenosil in August, 2004. At the hearing, Nelson testified that Prenosil has "issues with communication skills, stress, anxiety, paranoia, [and] these [types] of things."[3] Nelson further testified that when she started working with Prenosil, their communication and relationship was mostly stable. By spring, 2005, however, Nelson indicated that things began to fall apart. Nelson testified that Prenosil had "a lot of problems with paranoia, inability to leave her home, her hygiene decreased. Her ability to follow through with her treatment plan decreased. We started seeing missed appointments. We started seeing a severe degree of irritability. She would have panic attacks for things that would probably not bother her."[4] Nelson further indicated that Prenosil's treatment began to improve after June, 2005. At the time of the hearing, Prenosil was involved in a twenty-five week "Steps Program" and went to psychological therapy twice each month.

### 3. *Vocational Expert's Testimony*

At the hearing, the ALJ provided vocational expert Marian Jacobs with a hypothetical for an individual with the following limitations:

> [The individual] was limited to lifting no more than 20 pounds occasionally, ten pounds frequently and not about shoulder level, could sit for six to eight hours in a day with normal breaks, could stand and move about for six to eight hours a day with normal breaks, could occasionally bend, squat, crawl or kneel or stoop or climb stairs, seldom climb ladders or work at heights, could not push right foot controls repetitively, ... because of the knee problem. Work should be simple, routine, repetitive to complicated[.] ... [The individual] is best at quality control and assurance type work. The work should involve no more than short superficial verbal interaction with the public because of the tremor in [the individual's] voice which is sometimes present while speaking to others. The public may be present in the work area. The work should also involve no more than superficial verbal interaction with coworkers when performing [his or] her job duties and [the coworkers] could also be present in [the] work area. In order to avoid excessive stress, the work should not involve handling of emergency situations or complaints, directing the work of others or traveling to new places.

(Administrative Record at 483–84) The vocational expert testified that under such limitations, Prenosil could return to her past relevant work as a lab technician and production worker. Next, the ALJ added the following limitation:

---

and Prenosil offers no argument regarding this finding in her brief.

**3.** *See* Administrative Record at 476.

**4.** *Id.* at 476–77.

[Could Prenosil perform her past relevant work if she] frequently, which could be two-thirds of the time, [was] unable to complete her tasks or attend her work site or remain at the work site because of symptoms of her anxiety and depression which often made her unable to leave home or be around people? How would that effect her ability to perform [her past relevant work?]

(Administrative Record at 484–85) The vocational expert testified that such a limitation would preclude Prenosil from performing her past relevant work.

Prenosil's attorney also questioned the vocational expert. Prenosil's attorney asked the vocational expert whether Prenosil could find competitive employment if she could not attend work three or more days per month due to her mental and/or physical impairments. The vocational expert testified that Prenosil would be precluded from competitive employment under such circumstances. Prenosil's attorney also asked whether an individual who took unscheduled breaks more than normally allowed for 30 to 40 minutes at a time could find competitive employment. The vocational expert testified that such a limitation would also preclude competitive employment.

### C. Prenosil's Medical History

On September 17, 2002, Prenosil was admitted to St. Luke's Hospital in Cedar Rapids, Iowa for suicidal ideation. Prenosil informed the doctors in the emergency room that she suffered from depression and anxiety and felt that she did not "have much will to live anymore" and was fearful that she would harm herself. Dr. Dwight J. Schroeder, M.D., noted that Prenosil had decreased energy, mood, appetite, motivation, interest, and concentration, crying spells, feelings of worthlessness, hopeless-

ness, and guilt, trouble making decisions, social withdrawal, irritability, suspiciousness, excessive worrying, thoughts that life was not worth living, and suicidal ideation with the plan of using drugs. Prenosil was diagnosed with major depressive disorder and anxiety disorder with anxiety attacks. At the hospital, she was treated with medication and discharged on September 20, 2002. Prenosil's discharge medication included BuSpar, Diazepam, Imipramine, Toprol XL, and Zoloft.

On September 2, 2003, Prenosil underwent a psychological evaluation by Dr. Robert E. Hammer, Ph.D., a licensed psychologist. In discussing her background information, Dr. Hammer noted "[Prenosil] denies religious affiliation, organizational participation, or peer relationships. She states that she is 'isolated' and that her leisure interests and social contacts are her parakeet and her cat."[5] Dr. Hammer diagnosed Prenosil with major depressive disorder, recurrent and severe without psychotic features, posttraumatic stress disorder, and generalized anxiety disorder with agoraphobia. Dr. Hammer concluded that Prenosil would have the following work-related limitations:

She would be able to understand and remember instructions but her low energy level and anxiety level will make it very difficult for her to maintain the attention and concentration necessary to carry out those tasks. She will have extreme difficulty in interacting appropriately with co-workers and, especially, the public, but may be able to relate to a very supportive and understanding Supervisor. Her anxiety would preclude her ability to exercise independent judgment and decision-making in a work setting as well as making it very difficult

5. *See* Administrative Record at 253.

for her to respond appropriately to changes in the work place.

(Administrative Record at 256)

On September 17, 2003, Prenosil was examined by Dr. Whealen M. Koontz, M.D., for Disability Determination Services ("DDS"). Dr. Koontz noted that Prenosil suffered from anxiety and depression and was largely homebound. Dr. Koontz also noted that she complained of pain in her right shoulder. Upon examination, Dr. Koontz determined that Prenosil's range of motion for her right shoulder was satisfactory and her muscle strength around her shoulder was normal. Dr. Koontz also noted that her gait and all of her other joints were normal. Dr. Koontz further found that "she did not complain of anything suggestive of fibromyalgia." [6] Dr. Koontz diagnosed Prenosil with anxiety and depression, morbid obesity, apparent hypertension, and right shoulder pain. Dr. Koontz concluded:

> [Prenosil's] disability is chiefly psychiatric in origin. Given her morbid obesity, she would not be able to hold any job that required any significant physical activity. There is some mild limitation of motion about her right shoulder.
>
> She certainly needs psychiatric care and I urged her to seek out the avenues available to her.

(Administrative Record at 258)

On October 27, 2003, Dr. M. Jane Bibber, Ph.D., performed the Psychiatric Review Technique for Prenosil for DDS. Dr. Bibber diagnosed Prenosil with depressive syndrome. Dr. Bibber determined that Prenosil had the following depressive symptoms: Anhedonia or pervasive loss of interest in almost all activities, appetite disturbance, sleep disturbance, decreased energy, feelings of guilt or worthlessness, difficulty concentrating or thinking, and thoughts of suicide. Dr. Bibber also diagnosed Prenosil with anxiety disorder. Dr. Bibber found that Prenosil had the following symptoms associated with an anxiety disorder: Generalized persistent anxiety accompanied by motor tension, autonomic hyperactivity, apprehensive expectation, agoraphobia, recurrent severe panic attacks manifested by a sudden unpredictable onset of intense apprehension, fear, terror, and sense of impending doom occurring on the average at least once per week, and recurrent and intrusive recollections of a traumatic experience, which are a source of marked distress. Dr. Bibber also found the following limitations: Moderate restriction of activities of daily living, marked difficulties in maintaining social functioning, and marked difficulties in maintaining concentration, persistence, or pace. Dr. Bibber concluded:

> [Prenosil's] record is consistent. [Prenosil's] mental allegation is supported by [her] medically determinable mental impairments (MDIs) of Major Depressive Disorder, Recurrent, Severe; Posttraumatic Stress Disorder; and Generalized Anxiety Disorder with Agoraphobia. These MDIs have markedly limited [Prenosil's] ability to work since the Psychological CE [(Consultative Examination)] on 09/02/03.... Considering the duration, frequency, intensity, the functionally limiting effect of the mental symptoms and findings, and the moderate intervention thus far, we find that [Prenosil's] MDIs are severe but are not expected to be so for 12 months after 09/02/03, when the severity of her MDIs [were] documented.

(Administrative Record at 276)

On November 22, 2003, Dr. Dennis A. Weis, M.D., provided a physical residual functional capacity ("RFC") assessment

---

6. *See* Administrative Record at 258.

for Prenosil to DDS. Dr. Weis determined that Prenosil could: (1) Occasionally lift 20 pounds; (2) frequently lift 10 pounds; (3) stand and/or walk with normal breaks for a total of about six hours in an eight-hour workday; (4) sit with normal breaks for a total of about six hours in an eight-hour workday; and (5) push and/or pull without limitations. Dr. Weis further determined that Prenosil could occasionally climb, balance, stoop, kneel, crouch, and crawl. Dr. Weis also found no manipulative limitations, except for overhead reaching, no visual limitations, no communicative limitations, and no environmental limitations for Prenosil. Dr. Weis concluded:

> A number of [Prenosil's] allegations cannot be supported by evidence contained in the file eroding her credibility to a degree. In addition to this in spite of her complaints of pain she takes only over the counter medications. Examining sources make [*sic*] non specific recommendations not inconsistent with this RFC. All evidence considered she should be capable of RFC as outlined.

(Administrative Record at 289)

On May 20, 2004, Prenosil met with Dr. Sinda Eggerman, Ph.D., a licensed psychologist at the Abbe Center. Dr. Eggerman diagnosed her with major depressive disorder, generalized anxiety disorder, and personality disorder. Dr. Eggerman recommended that she see Prenosil every two weeks for individual psychotherapy to work on anxiety and depression management. On June 1, 2004, Prenosil met with Dr. Collyer Ekholm, M.D., a staff psychiatrist at the Abbe Center. Dr. Ekholm's notes indicated that Prenosil was uncooperative during their meeting and Dr. Ek-

holm diagnosed her with depressive disorder and probable personality disorder. Dr. Ekholm prescribed Diazepam and Lexapro as treatment.[7] Dr. Eggerman's progress notes indicate that she met regularly with Prenosil between June, 2004 and July, 2005. Between June, 2004 and January, 2005, Dr. Eggerman's progress notes consistently report that Prenosil was depressed at their therapy sessions and depressed in between their therapy sessions. In February, 2005 and March, 2005, Dr. Eggerman's progress notes indicate that Prenosil was less depressed and doing better. At a therapy session on March 22, 2005, however, Dr. Eggerman found Prenosil to be depressed again and stated "[s]he seems to be returning to her hopeless and pessimistic attitude."[8] The final progress note from Dr. Eggerman contained in the record is dated July 18, 2005. In that progress note, Dr. Eggerman provided that Prenosil's mood was angry and defensive and she had been using marijuana and meth twice per week for about six weeks.

On October 5, 2004, Dr. Dee E. Wright, Ph.D., reviewed Prenosil's medical records and provided DDS with Mental RFC and Psychiatric Review Technique assessments for Prenosil. Dr. Wright determined that Prenosil was moderately limited in her ability to: Carry out detailed instructions; maintain attention and concentration for extended periods; work in coordination with or proximity to others without being distracted by them; complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of

---

**7.** Due to an apparent conflict between Prenosil and Dr. Ekholm, Prenosil regularly met with Dr. Ali Safdar, M.D., Medical Director at the Abbe Center, for her prescription drug medication.

**8.** *See* Administrative Record at 326.

rest periods; get along with coworkers or peers without distracting them or exhibiting behavioral extremes; respond appropriately to changes in the work setting; and set realistic goals or make plans independently of others. Dr. Wright further determined that Prenosil suffered from depressive syndrome and found the following symptoms to support her determination: Sleep disturbance, decreased energy, difficulty concentrating or thinking, and thoughts of suicide. Dr. Wright also found that Prenosil had an anxiety disorder and a personality disorder. Dr. Wright further found that Prenosil had the following limitations: Mild restriction of activities of daily living, moderate difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace. Dr. Wright concluded:

> The preponderance of the evidence in [Prenosil's] file would support moderate cognitive restrictions of function in [her] case. [Prenosil] does exhibit variable sustained attention and concentration. [Prenosil] would have moderate limitations of function in her ability to carry out detailed instructions on a prolonged, consistent basis. Despite these restrictions, [Prenosil] is able to sustain sufficient concentration and attention to perform noncomplex, repetitive, and routine cognitive activity without serious limitations of function.

> The evidence in [Prenosil's] file would support some limitations of function with social interaction when [she] is unduly stressed. Given [Prenosil's] history, she would function best in settings where she [was] not required to have frequent stressful contact with large numbers of unfamiliar individuals. In a low stress and predictable environment, however, [Prenosil] can sustain short-lived, super-ficial interaction with others when it is in her perceived interest to do so.

> The evidence in the file does not indicate that [Prenosil] is currently manifesting severe limitations of function with self-care or other activities of daily living from a psychological perspective. [Prenosil] is able to engage in independent, goal oriented activity when it is in her perceived interest to do so.

> In summary, the evidence in [the] file indicates that [Prenosil] is diagnosed with medically determinable mental impairments—a major depressive disorder, a generalized anxiety disorder, a personality disorder (not otherwise specified), and a marijuana abuse disorder.

(Administrative Record at 310)

On December 16, 2004, Dr. Eggerman filled out a Mental Impairment Questionnaire ("Questionnaire") provided by Prenosil's attorney. When she filled out the Questionnaire, Dr. Eggerman noted that she had seen Prenosil a total of eight times. Dr. Eggerman indicated that Prenosil suffered from major depression, panic disorder with agoraphobia, and personality disorder. Dr. Eggerman noted that Prenosil was being treated with medication, pain management, anxiety management skills, and cognitive/behavioral treatment for depression. Dr. Eggerman noted the following "clinical" findings: Frequent feelings of hopelessness and worthlessness leading to suicidal ideation, flashbacks, panic attacks, physiological reactivity, dissociation and other signs of severe stress, and anxiety. Dr. Eggerman also provided the following prognosis for Prenosil: "Symptoms are somewhat alleviated by (but not relieved) medication. Psychotherapy can help her control her psychic and physical pain enough that she can probably stay out of the hospital or long term

[care]." [9]

Next, Dr. Eggerman identified the following "significant" signs and symptoms of Prenosil's mental impairments: Anhedonia or pervasive loss of interest in almost all activities, appetite disturbance with weight change, decreased energy, thoughts of suicide, blunt, flat or inappropriate affect, feelings of guilt or worthlessness, generalized persistent anxiety, somatization unexplained by organic disturbance, mood disturbance, recurrent and intrusive recollections of a traumatic experience, which are a source of marked distress, pathological passivity, persistent nonorganic disturbance of movement, change in personality, apprehensive expectation, paranoid thinking or inappropriate suspiciousness, motor tension, autonomic hyperactivity, memory impairment, sleep disturbance, emotional withdrawal or isolation, recurrent severe panic attacks manifested by a sudden unpredictable onset of intense apprehension, fear, terror and sense of impending doom occurring on the average of at least once a week, and a history of multiple physical symptoms of several years duration beginning before age 30, that have caused the individual to take medicine frequently, see a physician often and alter life patterns significantly. Dr. Eggerman also noted that Prenosil had "some" poverty of content of speech, difficulty thinking or concentrating, and illogical thinking.

Dr. Eggerman found that Prenosil was limited but satisfactory in her ability to carry out very short and simple instructions and adhering to basic standards of neatness and cleanliness. Dr. Eggerman further found that she was seriously limited, but not precluded from understanding and remembering very short and simple instructions and being aware of normal hazards and taking appropriate precau-

tions. Dr. Eggerman determined that Prenosil was unable to meet the competitive standards for remembering work-like procedures, making simple work-related decisions, asking simple questions or requesting assistance, carrying out detailed instructions, and using public transportation. Dr. Eggerman further determined that Prenosil had no useful ability to function in maintaining attention for a two hour segment, maintaining regular attendance and being punctual within customary tolerances, sustaining an ordinary routine with special supervision, working in coordination with or in proximity to others without being unduly distracted, completing a normal workday and workweek without interruptions from psychologically based symptoms, performing at a consistent pace without an unreasonable number and length of rest periods, accepting instructions and responding appropriately to criticism from supervisors, getting along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes, responding appropriately to changes in a routine work setting, dealing with normal work stress, understanding and remembering detailed instructions, setting realistic goals or making plans independently of others, dealing with stress of semiskilled and skilled work, interacting appropriately with the general public, maintaining socially appropriate behavior, and traveling in an unfamiliar place. Dr. Eggerman also found that Prenosil had marked restriction of activities of daily living, extreme difficulties in maintaining social functioning, and extreme deficiencies of concentration, persistence, or pace. Lastly, Dr. Eggerman determined that Prenosil suffered at least three episodes of decompensation which lasted for a minimum of two weeks within a twelve month

9. *See* Administrative Record at 317.

period. Dr. Eggerman concluded that Prenosil's "level of anxiety and depression preclude her from being able to function at work, she breaks down, has panic attacks, [and] 'shuts down' . . . under even minimal stress."[10]

## V. CONCLUSIONS OF LAW

### A. ALJ's Disability Determination

The ALJ determined that Prenosil is not disabled. In making this determination, the ALJ was required to complete the five-step sequential test provided in the social security regulations. *See* 20 C.F.R. § 404.1520(a)-(f); *Bowen v. Yuckert,* 482 U.S. 137, 140, 107 S.Ct. 2287, 96 L.Ed.2d 119 (1987); *Page v. Astrue,* 484 F.3d 1040, 1042 (8th Cir.2007); *Anderson v. Barnhart,* 344 F.3d 809, 812 (8th Cir.2003). The five steps an ALJ must consider are:

> (1) whether the claimant is gainfully employed, (2) whether the claimant has a severe impairment, (3) whether the impairment meets the criteria of any Social Security Income listings, (4) whether the impairment prevents the claimant from performing past relevant work, and (5) whether the impairment necessarily prevents the claimant from doing any other work.

*Goff v. Barnhart,* 421 F.3d 785, 790 (8th Cir.2005) (citing *Eichelberger v. Barnhart,* 390 F.3d 584, 590 (8th Cir.2004)); *see also* 20 C.F.R. § 404.1520(a)-(f). "If a claimant fails to meet the criteria at any step in the evaluation of disability, the process ends and the claimant is determined to be not disabled." *Eichelberger,* 390 F.3d at 590–91 (citing *Ramirez v. Barnhart,* 292 F.3d 576, 580 (8th Cir.2002)).

"To establish a disability claim, the claimant bears the initial burden of proof to show that he [or she] is unable to perform his [or her] past relevant work."

*Frankl v. Shalala,* 47 F.3d 935, 937 (8th Cir.1995) (citing *Reed v. Sullivan,* 988 F.2d 812, 815 (8th Cir.1993)). If the claimant meets this burden, the burden of proof then shifts to the Commissioner to demonstrate that the claimant retains the residual functional capacity to perform a significant number of other jobs in the national economy that are consistent with claimant's impairments and vocational factors such as age, education, and work experience. *Id.* The RFC is the most an individual can do despite the combined effect of all of his or her credible limitations. 20 C.F.R. § 416.945. " 'It is the ALJ's responsibility to determine a claimant's RFC based on all relevant evidence, including medical records, observations of treating physicians and others, and claimant's own descriptions of his [or her] limitations.' " *Tellez v. Barnhart,* 403 F.3d 953, 957 (8th Cir.2005) (quoting *Pearsall v. Massanari,* 274 F.3d 1211, 1217 (8th Cir.2001)).

The ALJ applied the first step of the analysis and determined that Prenosil had not engaged in substantial gainful activity since her alleged onset date, April 30, 2003. At the second step, the ALJ concluded, from the medical evidence, that Prenosil had the following impairments "major depressive disorder; anxiety disorder; borderline personality disorder; obesity; benign essential tremor; [and] hypertension, well-controlled by medication." At the third step, the ALJ found that Prenosil did not have "an impairment or combination of impairments listed in or medically equal to one listed in [20 C.F.R. § 404,] Appendix 1, Subpart P, Regulations No. 4 [(the Listing of Impairments)]." At the fourth step, the ALJ determined Prenosil's RFC as follows:

> [Prenosil] has had the residual functional capacity to perform the physical exer-

---

**10.** *See* Administrative Record at 320.

tional and nonexertional requirements of work except for: lifting ... more than 20 pounds occasionally and 10 pounds frequently, but not above right shoulder level. She can sit for six to eight hours in a day with normal breaks. She can stand and move around for six to eight hours total with normal breaks. She can occasionally bend, squat, crawl, kneel, stoop, and climb stairs. She should seldom climb ladders and heights. She can not push right foot controls repetitively. The work should be simple, routine, repetitive to complicated in that [Prenosil] is best at quality control and assurance type work. The work should involve no more than short, superficial verbal interaction with the public due to a tremor in her voice which is sometimes present while speaking to others. The public may be present in the work area. The work should involve no more than superficial verbal interaction with coworkers of performing the job duties. Other workers may be physically present in the work area. In order to avoid stress, the work should not involve the handling of emergency situations or complaints; or directing of others; or travel to new places.

Using this RFC, the ALJ determined that Prenosil's "past relevant work as a lab tech as generally performed in the national economy did not require the performance of work-related activities precluded by the above limitations.... [Prenosil's] impairments did not and do not prevent [her] from performing her past relevant work." Therefore, the ALJ concluded that since Prenosil was capable of performing her past relevant work, she was "not disabled."

## B. Whether the ALJ's Disability Determination is Supported by Substantial Evidence

Prenosil contends that the ALJ erred in four respects. First, Prenosil argues that

in his decision, the ALJ failed to provide good reasons for discounting the opinions of Dr. Eggerman, her treating psychologist. Second, Prenosil argues that the ALJ failed to properly consider the testimony and evidence offered by Tonya Nelson, her case manager at the Abbe Center. Third, Prenosil argues that the ALJ failed to consider the reports and findings from DVRS, including evidence from Ann Alliger, her vocational rehabilitation counselor. Lastly, Prenosil argues that the ALJ failed to properly evaluate the credibility of her subjective allegations of pain, functional limitation, and disability. Prenosil requests that the Court reverse the Commissioner's decision and remand it with directions to award benefits. Alternatively, Prenosil requests this matter be remanded for further proceedings. The Commissioner argues that there is substantial evidence in the record as a whole which supports the ALJ's decision; and therefore, the decision should be affirmed.

### 1. Dr. Eggerman's Opinions

Prenosil asserts that Dr. Eggerman's opinions, as her treating psychologist, are entitled to significant weight. *See* 20 C.F.R. § 404.1527(d)(2)(I) (providing that the longer the treating relationship between a physician and a patient, the more weight should be given to that treating physician's medical opinions). Prenosil argues that the opinions expressed by Dr. Eggerman in her responses to the Mental Impairment Questionnaire provided by Prenosil's attorney are similar to the opinions expressed by Dr. Hammer, a psychologist who examined Prenosil and provided a psychological evaluation for her. Specifically, Prenosil argues that Dr. Hammer's conclusions that her "low energy level and anxiety level made it difficult for her to maintain attention and concentration necessary to carry out tasks ... [and h]er

anxiety precluded her ability to exercise independent judgment and decision making in a work setting"[11] are similar to the conclusions drawn by Dr. Eggerman in the Questionnaire. Prenosil further argues that the ALJ improperly substituted his opinion for the opinions of her treating and examining psychologists and the ALJ's opinions are inconsistent with medical evidence in the record. Prenosil concludes that "[n]one of the reasons given by the ALJ withstands scrutiny. The ALJ inappropriately relied on his own interpretation of the medical records rather than the opinions of the medical sources."[12]

The ALJ attributed no weight to the opinions expressed by Dr. Eggerman in the Questionnaire. The ALJ found that Dr. Eggerman's responses to the Questionnaire were not internally consistent and were not consistent with her treating progress notes or the record as a whole. Specifically, the ALJ noted that Dr. Eggerman indicated that Prenosil suffered three or more episodes of decompensation in a twelve month period, each lasting at least two weeks. The ALJ found, however, that "[t]he record has not established multiple occurrences of inpatient treatment or placement in a highly structured environment consistent with a severe flare of symptoms lasting two weeks each. Furthermore, [Dr. Eggerman] felt that medication and therapy would keep [Prenosil] out of the hospital or long term placement."[13] The ALJ also found Preno-

sil's activities of daily living, including her ability to drive and keep good hygiene, to be inconsistent with the severe limitations suggested by Dr. Eggerman in the Questionnaire. Lastly, the ALJ noted that Dr. Eggerman filled out the Questionnaire with Prenosil's help, particularly on questions she was not sure about.[14] The ALJ determined that this practice made the answers to the Questionnaire less credible than if Dr. Eggerman had filled out the Questionnaire without Prenosil's help.

▇▇▇ An ALJ is required to "assess the record as a whole to determine whether treating physicians' opinions are inconsistent with substantial evidence on the record." *Travis v. Astrue,* 477 F.3d 1037, 1041 (8th Cir.2007) (citing 20 C.F.R. § 404.1527(d)(2)). The opinion of a treating physician:

> should not ordinarily be disregarded and is entitled to substantial weight. A treating physician's opinion regarding an applicant's impairment will be granted controlling weight, provided the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record.

*Singh v. Apfel,* 222 F.3d 448, 452 (8th Cir.2000) (citations omitted). The regulations also require an ALJ to give "good reasons" for rejecting statements provided by a treating physician. *Id.* "Although a

---

11. *See* Prenosil's Brief at 13–14.

12. *Id.* at 16.

13. *See* Administrative Record at 25; *see also* the Questionnaire, Administrative Record at 317.

14. *See* Dr. Eggerman's Progress Note, dated December 16, 2004, Administrative Record at 334. The Progress Note provides in pertinent part:

> Current session goal was to fill out parts of the mental impairment questionnaire that had been sent by [Prenosil's attorney]. There were a couple of situations where she seems to meet two different categories and I talked with her about which one was most appropriate.
> . . .
> We filled out parts of the questionnaire that I was uncertain about . . .
> *Id.*

treating physician's opinion is entitled to great weight, it does not automatically control or obviate the need to evaluate the record as a whole." *Hogan v. Apfel*, 239 F.3d 958, 961 (8th Cir.2001) (citing *Prosch v. Apfel*, 201 F.3d 1010, 1013 (8th Cir. 2000)). "The ALJ may discount or disregard such an opinion if other medical assessments are supported by superior medical evidence, or if the treating physician has offered inconsistent opinions." *Id.; see also Travis*, 477 F.3d at 1041 ("A physician's statement that is 'not supported by diagnoses based on objective evidence' will not support a finding of disability. *Edwards v. Barnhart*, 314 F.3d 964, 967 (8th Cir.2003). If the doctor's opinion is 'inconsistent with or contrary to the medical evidence as a whole, the ALJ can accord it less weight.' *Id.*"); *Strongson*, 361 F.3d at 1070 (an ALJ does not need to give controlling weight to a physician's RFC assessment if it is inconsistent with other substantial evidence in the record); *Cabrnoch v. Bowen*, 881 F.2d 561, 564 (8th Cir.1989) (the resolution of conflicts of opinion among various treating and examining physicians is the proper function of an ALJ).

In filling out the Questionnaire, Dr. Eggerman found that Prenosil was limited but satisfactory in her ability to carry out very short and simple instructions and adhering to basic standards of neatness and cleanliness. Dr. Eggerman further found that she was seriously limited, but not precluded from understanding and remembering very short and simple instructions and being aware of normal hazards and taking appropriate precautions. Dr. Eggerman determined that she was unable to meet the competitive standards for remembering work-like procedures, making simple work-related decisions, asking simple questions or requesting assistance, carrying out detailed instructions, and using public transportation. Dr. Eggerman fur-

ther determined that Prenosil had no useful ability to function in maintaining attention for a two hour segment, maintaining regular attendance and being punctual within customary tolerances, sustaining an ordinary routine with special supervision, working in coordination with or in proximity to others without being unduly distracted, completing a normal workday and workweek without interruptions from psychologically based symptoms, performing at a consistent pace without an unreasonable number and length of rest periods, accepting instructions and responding appropriately to criticism from supervisors, getting along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes, responding appropriately to changes in a routine work setting, dealing with normal work stress, understanding and remembering detailed instructions, setting realistic goals or making plans independently of others, dealing with stress of semiskilled and skilled work, interacting appropriately with the general public, maintaining socially appropriate behavior, and traveling in an unfamiliar place. Dr. Eggerman also found that Prenosil had marked restriction of activities of daily living, extreme difficulties in maintaining social functioning, and extreme deficiencies of concentration, persistence, or pace. Lastly, Dr. Eggerman determined that Prenosil suffered at least three episodes of decompensation which lasted for a minimum of two weeks within a twelve month period.

■ Having reviewed the entire record, the Court finds that Dr. Eggerman's responses to the Questionnaire are inconsistent with the findings provided in her Progress Notes from June, 2004 through July, 2005. Even though the Progress Notes consistently provide that Prenosil was depressed at the time of their therapy sessions, the Progress Notes do not contain any evidence suggesting the severe

limitations provided by Dr. Eggerman in her responses to the Questionnaire. In fact, on the day that she filled out the Questionnaire, Dr. Eggerman noted that Prenosil "said she's been getting out a little more. She's going to the Tuesday skills group.... Mood in session was okay. She reports feeling better between sessions."[15] The Court finds that the inconsistencies between Dr. Eggerman's answers in the Questionnaire and the information provided in her Progress Notes supports the conclusion of the ALJ that her opinions are entitled to no weight. *See Edwards*, 314 F.3d at 967 (If the doctor's opinion is "inconsistent with or contrary to the medical evidence as a whole, the ALJ can accord it less weight."). Furthermore, the Court finds that the ALJ provided good reasons for granting no weight to Dr. Eggerman's opinions.[16] The Court further determines that the ALJ's reasons are supported by substantial evidence in the record as a whole. *See Vester*, 416 F.3d at 889. Even if inconsistent conclusions could be drawn on this issue, the court upholds the conclusions of the ALJ because they are supported by substantial evidence on the record as a whole. *Guilliams*, 393 F.3d at 801.

### 2. *Tonya Nelson's Testimony*

Prenosil argues that the ALJ "failed to evaluate [Nelson's] testimony and evidence as required by SSR [(Social Security Ruling)] 06–3p."[17] As Prenosil's case manager, Nelson would be considered a "nonmedical other source." *See* 20 C.F.R. § 404.1513(d)(3). In discussing SSR 06–3p, the Eighth Circuit Court of Appeals, in *Sloan v. Astrue*, 499 F.3d 883 (8th Cir. 2007), pointed out:

> Information from these 'other sources' cannot establish the existence of a medically determinable impairment, according to SSR 06–3p. Instead, there must be evidence from an 'acceptable medical source' for this purpose. However, information from such 'other sources' may be based on special knowledge of the individual and may provide insight into the severity of the impairment(s) and how it affects the individual's ability to function.

*Sloan*, 499 F.3d at 888 (quoting SSR 06–3p). Prenosil points out that, at the hearing, Nelson testified that she has "issues with communication skills, stress, anxiety, paranoia, [and] these [types] of things."[18] Prenosil also points out that Nelson testified that by Spring 2005, she had "a lot of problems with paranoia, inability to leave her home, her hygiene decreased. Her ability to follow through with her treatment plan decreased. We started seeing missed appointments. We started seeing

---

**15.** *See* Administrative Record at 334.

**16.** *See* discussion of ALJ's reasons for giving not weight to Dr. Eggerman's opinions on pages 19–20 of this decision.

**17.** *See* Prenosil's Brief at 18. Additionally, SSR 06–3p was issued on August 9, 2006 by the Social Security Administration ("SSA"). The purpose of the ruling was to clarify how the SSA considers opinions from sources not classified as "acceptable medical sources." *See Sloan v. Astrue*, 499 F.3d 883, 888 (8th Cir.2007) (discussing SSR 06–3p). SSR 06–3p provides that when considering the opinion of a "non-medical source," such as teachers, counselors, or social workers "it would be appropriate to consider such factors as the nature and extent of the relationship between the source and the individual, the source's qualifications, the source's area of specialty or expertise, the degree to which the source presents relevant evidence to support his or her opinion, whether the opinion is consistent with other evidence, and any other factors that tend to support or refute the opinion." SSR 06–3p.

**18.** *See* Administrative Record at 476.

a severe degree of irritability. She would have panic attacks for things that would probably not bother her." [19] Prenosil offers no argument, however, regarding how the information provided by Nelson provides insight into the severity of her impairments or how it affects her ability to function. *See Sloan*, 499 F.3d at 888; SSR 06–3p. Furthermore, the record reflects that the ALJ considered Nelson's testimony and found its credibility questionable. In his decision, the ALJ states:

> [Nelson's] testimony ... does not establish that [Prenosil] is disabled. Since [Nelson] is not medically trained to make exacting observations as to dates, frequencies, types and degrees of medical signs and symptoms, or of the frequency or intensity of unusual moods or mannerisms, the accuracy of the testimony is questionable. Significant weight cannot be given to [Nelson's] testimony because it, like [Prenosil's], is simply not consistent with the preponderance of the evidence and inconsistencies in the record as a whole.

(Administrative Record at 29)

██ Assessment of the credibility of witness testimony lies within the province of the ALJ. *Siemers v. Shalala*, 47 F.3d 299, 302 (8th Cir.1995). Deference is given to an ALJ's witness credibility determination, if his or her determination is supported by good reasons and substantial evidence. *Vester*, 416 F.3d at 889 (citation omitted). After reviewing the record, the Court finds that the ALJ considered Nelson's testimony and explained the weight he gave the testimony. Accordingly, the Court will defer to the ALJ's credibility determination of Nelson's testimony. *Vester*, 416 F.3d at 889.

### 3. Evidence from the DVRS

In January, 2004, while receiving unemployment benefits after being laid off from her job at Lason, which subsequently closed, Prenosil was referred to DVRS by Iowa Workforce Development to help her find a job. Prenosil points out that reports from DVRS indicate that she had difficulty finding a job because of her anxiety disorder. Prenosil also suggests that her "vocational rehabilitation case was closed in February 2005 because her 'disability is too severe to benefit from services.' Ms. Alliger [(Prenosil's vocational counselor at DVRS)] closed Prenosil's case until [she] could manage her disability." [20] Similar to Nelson, Prenosil argues that the ALJ failed to properly evaluate the evidence from DVRS as required by SSR 06–3p.

██ The Court finds Prenosil's argument to be without merit. Not only did DVRS work with Prenosil from January, 2004 through October, 2004 for the purposes of helping her find employment, but the record provides that it was Prenosil who decided her disability was too severe to be helped by DVRS's services. A DVRS report, dated October 5, 2004, provides that Prenosil's file was placed in "Interrupted Status" because *Prenosil* decided not to take a job offered to her by Ruffalo Cody in its mail room. The report also provides that Prenosil informed DVRS that *she* wanted to get her health stable before taking advantage of its services. The report further states that *Prenosil* "stated that she 'does not think that she has the motivation level that is needed to work.'" [21] After reviewing the record, the Court finds that the ALJ considered the evidence provided by DVRS. Further-

---

**19.** *Id.* at 476–77.

**20.** *See* Prenosil's Brief at 19.

**21.** *See* Administrative Record at 161.

more, the Court finds that the DVRS reports are not inconsistent with the ALJ's findings and are supported by substantial evidence on the record as a whole. *See Vester*, 416 F.3d at 889. Accordingly, the Court determines that the ALJ did not err with regard to consideration of the evidence in the record provided by DVRS.

### 4. Credibility of Prenosil's Testimony

Prenosil argues that the ALJ improperly discredited her testimony regarding her subjective allegations of pain, functional limitations, and total disability. Prenosil maintains that the ALJ misapplied the *Polaski* factors for determining the credibility of her testimony at the administrative hearing. The Commissioner argues that the ALJ properly considered Prenosil's subjective complaints.

■■■ When evaluating the credibility of a claimant's subjective complaints, the ALJ may not disregard them "solely because the objective medical evidence does not fully support them." *Polaski*, 739 F.2d at 1322. However, the absence of objective medical evidence to support a claimant's subjective complaints is a relevant factor for an ALJ to consider. *Gowell v. Apfel*, 242 F.3d 793, 796 (8th Cir. 2001) (citation omitted). "The [ALJ] must give full consideration to all the evidence presented relating to subjective complaints, including the claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as: (1) the claimant's daily activities; (2) the duration, frequency, and intensity of the pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness and side effects of medication; [and] (5) functional restrictions." *Polaski*, 739 F.2d at 1322. Subjective complaints may be discounted if inconsistencies exist in the evidence as a whole. *Pelkey v. Barnhart*, 433 F.3d 575, 578 (8th Cir.2006) (citing *Polaski*, 739 F.2d at 1322). However, the ALJ must give reasons for discrediting the claimant. *Id.* (citing *Strongson*, 361 F.3d at 1072). Where an ALJ seriously considers, but for good reason explicitly discredits a claimant's subjective complaints, the Court will not disturb the ALJ's credibility determination. *Johnson v. Apfel*, 240 F.3d 1145, 1148 (8th Cir.2001) (citing *Pena v. Chater*, 76 F.3d 906, 908 (8th Cir.1996)); *see also Guilliams*, 393 F.3d at 801 (explaining that deference to an ALJ's credibility determination is warranted if the determination is supported by good reasons and substantial evidence). " 'The credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts.' " *Wagner v. Astrue*, 499 F.3d 842, 851 (8th Cir.2007) (quoting *Pearsall*, 274 F.3d at 1218).

■■■ In his decision, the ALJ provided the following reasons for discrediting Prenosil's subjective complaints: (1) Inconsistencies between Prenosil's subjective complaints and the medical evidence and record as a whole; (2) the fact that Prenosil's work did not end because of a disability, but rather because she was laid off from her previous employment; (3) Prenosil's inconsistencies in seeking treatment and using prescribed medication; (4) "faking bad" or "extreme exaggeration" of symptoms on a personality test; (5) inconsistencies between subjective complaints and activities of daily living; and (6) inconsistencies regarding the use and abuse of illegal substances throughout the record. The ALJ concluded:

> Based on ... inconsistencies in the record as a whole, [Prenosil's] allegations concerning the existence, persistence and intensity of symptoms and functional limitations are not given full weight or

credibility, but only such as reflected in the residual functional capacity assigned ...

(Administrative Record at 29) Having reviewed the record, the Court finds that the ALJ seriously considered Prenosil's subjective allegations of pain, functional limitations, and total disability, applied the *Polaski* factors, and discredited her allegations for good reasons. *See Pelkey,* 433 F.3d at 578 (good reasons must be given for discrediting a complainant); *see also Tellez,* 403 F.3d at 957 (deference to and ALJ's findings regarding the credibility of a claimant is supported by an ALJ's finding that a claimant's activities of daily living are inconsistent with his or her allegations of total disability). Therefore, the court will not disturb the ALJ's credibility determination. *Johnson,* 240 F.3d at 1147. After considering the weight of the evidence and balancing the factors supporting the ALJ's credibility determination against the factors in support of Prenosil's claim, the Court finds that the ALJ's determination that Prenosil's allegations of pain, functional limitations, and total disability were not credible is supported by substantial evidence. *See Vester,* 416 F.3d at 889.

## VI. CONCLUSION

The court finds that the ALJ considered all of the relevant evidence in this case, including the medical records of Prenosil's treating, examining, and evaluating sources, the testimony of Prenosil's witnesses, and Prenosil's own description of her conditions. *See Tellez,* 403 F.3d at 957. The ALJ's determination of Prenosil's RFC was influenced by his finding that Prenosil was not fully credible and Dr. Eggerman's opinions regarding Prenosil's mental impairments were entitled to no weight. Furthermore, the ALJ properly weighed the credibility of Prenosil's witnesses. Therefore, the Court determines that the ALJ's decision is supported by substantial evidence and shall be affirmed.

## VII. ORDER

For the foregoing reasons, it is hereby **ORDERED**:

1. The final decision of the Commissioner of Social Security is **AFFIRMED**;

2. Plaintiff's Complaint (docket number 3) is **DISMISSED** with prejudice; and

3. The Clerk of Court is directed to enter judgment accordingly.