# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 06-3448

_____

| | | |
|---|---|---|
| Donna Sloan, | * | |
| | * | |
| Plaintiff - Appellant, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the Southern |
| | * | District of Iowa. |
| Michael J. Astrue, Commissioner | * | |
| of Social Security, | * | |
| | * | |
| Defendant - Appellee. | * | |

_____

Submitted: May 14, 2007
Filed: August 22, 2007

_____

Before BYE and SMITH, Circuit Judges, and NANGLE,[1] District Judge.

_____

BYE, Circuit Judge.

Donna Sloan appeals the district court's judgment affirming the decision of the Commissioner of the Social Security Administration (SSA) denying her application for disability insurance benefits under Title II of the Social Security Act. See 42 U.S.C. § 1383(c)(3). A new SSA ruling clarifies the extent to which the agency should consider medical opinions from sources other than those deemed "acceptable

_____

[1]The Honorable John F. Nangle, United States District Judge for the Eastern District of Missouri, sitting by designation.

medical sources." The SSA must determine whether the new ruling affects its decision in this case. We reverse and remand.

I

Sloan first applied for benefits in December 2001 claiming total disability as a result of depression, anxiety disorders, back pain and migraine headaches. She is a high-school graduate with four semesters of college. Her work history includes having been a data-entry clerk, a secretary, a file clerk, a store clerk, and a paratransit driver. She reports to have struggled with anxiety and depression since childhood, with a nervous breakdown at age sixteen. She last worked on November 18, 2001, when she was fired by her temporary service agency for absenteeism.

Sloan suffered a panic attack on October 3, 2001, which sent her to a hospital emergency room complaining of chest pain and numbness. She had taken nitroglycerin, which had not helped. A doctor diagnosed "possible unstable angina" with a secondary diagnosis that included "anxiety with depression" and prescribed Effexor and Xanax. She returned to the emergency room the next day after suffering an adverse reaction to her new medications.

On October 5, Sloan visited her primary-care physician, Ben Gaumer, D.O., an osteopath, complaining of numbness in her arms and chest, "problems thinking," and being "shaky." Dr. Gaumer diagnosed anxiety and depression. Over the next few months, Dr. Gaumer adjusted her medications, which included Vistaril (anti-anxiety), Tranxene (same), and Premarin (menopausal symptoms). Though Sloan had ups and downs, Dr. Gaumer noted several times she was "happy" and her judgment, insight and memory were normal. Dr. Gaumer told her during this period her working days were over. He recommended she apply for disability.

In August 2003, Dr. Gaumer filled out the physician's certification section of a form Sloan was filing to seek forgiveness of her student loans. He wrote, "Severe Depression – In my opinion Ms. Sloan is totally disabled from this condition and I have no hope of recovery – this will persist the rest of her life."

In May 2003, Dr. Gaumer wrote, "Cont current meds / Overall, I see definite improvement but not well!!" His last examination of Sloan was September 26, 2003, when he described her as sad and anxious and suffering from depression and anxiety, along with nightmares and diarrhea.[2] Dr. Gaumer declined to give a diagnosis of Sloan's mental condition for the Social Security proceedings as he is not a mental-health specialist.

At the request of the Disability Determination Service (DDS), Sloan visited Greg Cohen, D.O., in February 2002 for a disability examination which focused primarily on her physical symptoms. Dr. Cohen found Sloan did have "significant migraines from time to time"; she did not have "any significant problems in terms of a back injury or back related problems"; and "any disability that she has is probably more related to psychiatric problems if at all and neurological problems and I believe those probably would benefit from continued workup."

In March 2002, also at the request of DDS, Sloan underwent a psychological evaluation by Jennifer Mac Connell, M.A., a psychologist, and Richard A. Martin, Ph.D., a licensed psychologist.[3] In their report, Mac Connell and Dr. Martin

---

[2]The record elsewhere indicates these are side effects of her medications.

[3]Sloan notes Mac Connell and Dr. Martin's report described their work as a "brief mental status examination" and a "brief interview," though a review of the document also shows they called it a "standard mental status examination." They do not indicate they thought the examination was inadequate to reach their conclusions.

concluded Sloan had the *cognitive* capabilities required to perform unskilled work, and her judgment was intact:

> Given her social and vocational history, she will not likely experience significant problems in her relationships with co-workers, supervisors, or the public. *However, her memory, attention, and concentration abilities may vary somewhat as a function of her overall emotional condition.* In summary, Ms. Sloan appears to have the *intellectual* abilities to handle a number of unskilled vocational options.

(emphases added). They rated her global assessment of functions (GAF) as having been 65 (mild impairment) for the prior year, and dropping to 57 (moderate impairment) at the time she was tested. Though Mac Connell and Dr. Martin made reference to Sloan's *emotional* condition, they did not comment on how they thought it bore on her ability to perform any sort of work.

A psychologist, Laura Mutchler, Ph.D., examined Sloan in October 2002. Dr. Gaumer had suggested seeing a psychiatrist, but she could not pay the costs out of pocket, and was instead referred to Dr. Mutchler, who assigned Sloan a GAF of 50 (serious impairment). She noted Sloan was struggling with her decision to apply for disability benefits. She recommended individual therapy for Sloan and an assessment of her medications. Dr. Muchtler's report was also signed by a psychiatrist.

In accordance with Dr. Mutchler's advice, Sloan began seeing Charlotte Kraai, a licensed mental health social worker, in November 2002. They met for a total of ten sessions over the next seven months. In a February 2003 report, Kraai described Sloan as "debilitated" and assessed her as having a GAF of 45-50. She wrote:

> Little has changed in the time she has been coming to therapy. If she continues to attend therapy and take prescribed medications prescribed appropriately by her physician, she can make some improvement through continuing to challenge irrational beliefs and continue teaching her

coping skills with probably very slow progress based on her initial response to therapy.

Kraai's analysis of Sloan's current condition was: restriction of daily living activities, "severely impaired" social functioning, and deficiency of concentration. Kraai predicted "decompensation in work or worklike settings. High likelihood as much of stress that contributed to current mental distress is workplace related." She rated Sloan's work-related mental ability to remember and understand instructions, procedures and locations as "difficult or impossible for her." She opined that Sloan "would probably have difficulty relating to authority figures and co-workers as [she] easily feels threatened and/or pressured and could quickly [become] overwhelmed and rapidly decompensate." Kraai's analysis was co-signed by a psychiatrist, Kent Kunze, M.D., who wrote next to his signature, "reviewed but not evaluated by me."

Patti Campidilli, a licensed clinical social worker, had counseled Sloan earlier, from November 1995 to February 1998, and from July 1999 until October 2001. In May 2003, Sloan decided to return to her after being dissatisfied with the counseling she received from Kraai (and finding Campidilli would charge her a lower fee as a former patient). They met monthly from June to December 2003. Campidilli noted at the outset in June 2003 that Sloan "had a difficult time making decisions, concentrating, and remembering information regarding dates and times." In a January 2004 report, Campidilli wrote:

> I believe Donna would have a very difficult time working at an acceptable pace for any employer. She tends to tire easily and has very little energy to perform tasks. Her inability to concentrate or focus would also make it difficult for her to work for someone. Donna tends to worry, almost obsessively[,] about what others are thinking of her and her performance. This kind of worry would be a hindrance to her job. I believe she would continue to be quite nervous and would, therefore, have a hard time completing her job duties with confidence and accuracy." Campidilli also noted she did not think Sloan was seeing her

doctor as often as she should "because she is completely responsible for those expenses.

She concluded, "I believe Donna will never be able to work full time again. At the present time the limitations of her depression combined with her physical condition would make it quite difficult for her to work at any job for any consistent amount of time."[4]

On January 28, 2002, Sloan completed a Daily Activities Questionnaire, in which she reported she regularly did laundry, cleaned dishes, changed sheets, vacuumed, took out the trash, and washed her car; she occasionally cooked; that she enjoyed reading, listening to the radio, "doing some family history work on [her] computer," and watching movies and television shows; and she lived with her 82-year-old mother, whom she took grocery shopping once weekly. She also reported going to the drive-through bank, the beauty shop, her doctors' offices, and the pharmacy. Overall, she reported as to her ability to drive an automobile, "as necessary, several times a week."

On the other hand, Sloan reported in the same document she no longer performed any chores outside her house. Her only trips to the grocery store, always with her mother, were early in the morning – and short, as "being around a lot of people really bothers me." She reported having "a lot" of difficulty going out in public. She also reported as to not participating in any type of group activities and had to give up being her church's organist because her nervousness was so severe she could not get her fingers to play right. "I was really having a time of it." She reported her medication was helping with *panic attacks,* but she did *not* say it was helping with "her anxiety" overall, as the Commissioner asserted.

---

[4]The government makes a point of stating that Campidilli diagnosed Sloan with merely "moderate depression," failing to add she ended the sentence, "moderate only because she denied suicidal or homicidal thoughts or attempts."

At a January 2005 hearing, an ALJ heard testimony from Sloan and a vocational expert (VE), Patricia Reilly. The ALJ asked for evidence from her attending psychiatrist. Sloan's lawyer replied she had never seen a psychiatrist because of her having to pay for her medical care out of pocket and could not afford one. Her lawyer explained she usually saw counselors instead.

The ALJ noted the evidence from the DDS psychologists and said:

So I don't have any other opinions, I guess, from, well, I have the counseling opinion, from the social worker, but as I said, we don't get real excited about social workers just because it's sort of a pecking order of authority, and usually in a mental case a person is seen by a psychiatrist, but you're saying today she has never been evaluated by a psychiatrist?

Legal counsel agreed, and reiterated Sloan could not afford such care.

The ALJ asked the VE to assume a hypothetical claimant who could perform sedentary to medium work, but who had moderate limitations in carrying out detailed work, maintaining attention and concentration for extended periods of time, performing activities within a fixed schedule, completing a normal workday without interruption from psychologically based symptoms, responding to changes in the work place, and setting realistic goals. Reilly testified such a claimant could not perform Sloan's past work, but could perform a variety of sedentary-to-medium-effort unskilled jobs, such as cashier, interviewer, administrative support worker, bookkeeper, and messenger. But when asked, "If [Sloan's] testimony is to be considered credible, the variety of symptoms that she had endorses [sic] today, do you feel that she could do the unskilled work that you've identified?" Reilly replied, "No. She mentioned several things that would preclude her from full-time employment. One of the largest barriers it looked like is the amount of sleep that she requires."

The ALJ concluded the objective medical evidence did not support the severity of Sloan's alleged symptoms. Reasons cited were:

- While Sloan went to the hospital for a severe panic attack on October 3, 2001, nothing in the record showed she ever had *another* attack severe enough to send her to the emergency room.

- Dr. Gaumer's notes provide no evidence to support his opinion that Sloan is disabled, because (a) he had only treated her for six months before filling out the form giving his opinion that she was sufficiently disabled that she should be released from her student-loan obligations,[5] and (b) his notes reflect she was improving. Dr. Gaumer's opinion of Sloan as disabled was given in a loan-forgiveness application context, with unknown criteria.

- "Likewise," the ALJ wrote, "a few intermittent visits to two different social workers do not establish a foundation for behavior modification to address anxiety successfully." He noted the social workers were not recognized as sources that could give evidence to prove a medically determinable impairment.

- "The undersigned gives little weight to the opinions expressed by these two social workers," Kraai and Campidilli, the ALJ wrote. "The dates of visits to social workers were intermittent and do not reflect any commitment to long term therapy which would be beneficial in dealing with treatment of mental impairment. One of the social workers suggested claimant attend group therapy but claimant did not do so . . . . The undersigned does take note that a psychiatrist also signed the report provided by Ms. Kraai. However, it is also noted that the psychiatrist also wrote that he reviewed the report but did not evaluate the claimant."

---

[5]This is incorrect. Dr. Gaumer had been treating Sloan for nearly two years – from October 2001 to August 2003 – when he filled out the form.

-8-

- "When compared to the evaluation done by DDS psychologists [Mac Connell and Dr. Martin] . . . more weight should be given to the DDS mental health professionals as the entire record provides more support to their conclusions that the claimant has some moderate mental limitations in her ability to function." The ALJ noted the psychologists found Sloan "possessed the cognitive capabilities required to work within a range of unskilled positions."

- The ALJ made note of Sloan's daily activities, and found, without further explanation, "These do not appear to be the activities of an individual with disabling anxiety."

- Without finding any particular part of Sloan's testimony to be false, the ALJ wrote, "In view of the preceding discussion, [I find] that the claimant's testimony, insofar as it pertained to the inability to perform virtually any type of work activity on a sustained basis, was not credible."

- The ALJ then noted the list of positions the vocational expert provided, and stated, "the vocational expert also testified that these jobs represent a larger field of jobs that the claimant could perform."

The ALJ denied Sloan's disability claim, as did the SSA's appeals council, which made the ALJ's decision the final decision of the Commissioner. The district court affirmed the Commissioner's decision.

II

On August 9, 2006, the SSA issued Social Security Ruling (SSR) 06-3p, 71 Fed. Reg. 45,593 (Aug. 9, 2006). The ruling clarified how it considers opinions from sources who are not what the agency terms "acceptable medical sources."

Social Security separates information sources into two main groups: *acceptable medical sources* and *other sources.* It then divides *other sources* into two groups: *medical sources* and *non-medical sources.* 20 C.F.R. §§ 404.1502, 416.902 (2007).

*Acceptable medical sources* include licensed physicians (medical or osteopathic doctors) and licensed or certified psychologists. 20 C.F.R. §§ 404.1513(a), 416.913(a) (2007). According to Social Security regulations, there are three major distinctions between acceptable medical sources and the others: (1) Only acceptable medical sources can provide evidence to establish the existence of a medically determinable impairment, id., (2) only acceptable medical sources can provide medical opinions, 20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2) (2007), and (3) only acceptable medical sources can be considered treating sources, 20 C.F.R. §§ 404.1527(d) and 416.927(d) (2007).

*Other sources: Medical sources* include nurse practitioners, physician assistants, licensed clinical social workers, naturopaths, chiropractors, audiologists, and therapists. *Non-medical sources include* school teachers and counselors, public and private social welfare agency personnel, rehabilitation counselors, spouses, parents and other caregivers, siblings, other relatives, friends, neighbors, clergy, and employers. 20 C.F.R. §§ 404.1513(d), 416.913(d) (2007).

"Information from these 'other sources' cannot establish the existence of a medically determinable impairment," according to SSR 06-3p. "Instead, there must be evidence from an 'acceptable medical source' for this purpose. However, information from such 'other sources' may be based on special knowledge of the individual and may provide insight into the severity of the impairment(s) and how it affects the individual's ability to function."

SSR 06-3p is a clarification of existing SSA policies. The SSA explained its reasons for issuing the ruling:

With the growth of managed health care in recent years and the emphasis on containing medical costs, medical sources who are not "acceptable medical sources," such as nurse practitioners, physician assistants, and licensed clinical social workers, have increasingly assumed a greater percentage of the treatment and evaluation functions previously handled primarily by physicians and psychologists. Opinions from these medical sources, who are not technically deemed "acceptable medical sources" under our rules, are important and should be evaluated on key issues such as impairment severity and functional effects, along with the other relevant evidence in the file.

The ruling directs the SSA's adjudicators to give weight to opinions from medical sources who are not "acceptable medical sources":

Opinions from "other medical sources" may reflect the source's judgment about some of the same issues addressed in medical opinions from "acceptable medical sources," including symptoms, diagnosis and prognosis, what the individual can still do despite the impairment(s), and physical and mental restrictions . . . .

[D]epending on the particular facts in a case, and after applying the factors for weighing opinion evidence, an opinion from a medical source who is not an "acceptable medical source" may outweigh the opinion of an "acceptable medical source," including the medical opinion of a treating source. For example, it may be appropriate to give more weight to the opinion of a medical source who is not an "acceptable medical source" if he or she has seen the individual more often than the treating source and has provided better supporting evidence and a better explanation for his or her opinion.

In general, according to the ruling, the factors for considering opinion evidence include:

- How long the source has known and how frequently the source has seen the individual;

- How consistent the opinion is with other evidence;

- The degree to which the source presents relevant evidence to support an opinion;

- How well the source explains the opinion;

- Whether the source has a specialty or area of expertise related to the individual's impairment(s); and

- Any other factors that tend to support or refute the opinion.

## III

We review de novo the district court's decision upholding the Commissioner's denial of disability benefits. Bowman v. Barnhart, 310 F.3d 1080, 1083 (8th Cir. 2002).

The SSA issued SSR 06-3p in August 2006, after the ALJ and the district court had issued their decisions. "Generally, if an agency makes a policy change during the pendency of a claimant's appeal, the reviewing court should remand for the agency to determine whether the new policy affects its prior decision." Ingram v. Barnhart, 303 F.3d 890, 893 (8th Cir. 2002). Such a remand is appropriate in this case.[6] Sloan presented evidence from her health-care providers which could very well have led to a different result had the ALJ assessed them in accordance with SSR 06-3p.

---

[6]We note the SSA terms the ruling a clarification in how it should consider opinions from sources who are not "acceptable medical sources." We also note the agency cited the ruling twice in its brief to this court in this case.

-12-

# IV

Sloan is a seriously ill person of very limited financial means who lacks the ability to afford a psychiatrist, or even to see social workers more than once a month. The ALJ summarily dismissed the records and recommendations from her health-care professionals simply because they were too low on the pecking order as he understood it to exist at the time of the hearing. The SSA must determine whether its new ruling clarifying its assessment of opinions from sources other than those deemed "acceptable medical sources" affects its prior decision in this matter. Accordingly, we reverse and remand the judgment of the district court with instructions to remand to the SSA for an administrative rehearing consistent with this opinion.

_____