# United States Court of Appeals

### For the Eighth Circuit

_____

No. 18-1910

_____

Robert Paul Dols

*Plaintiff - Appellant*

v.

Andrew Saul,[1] Commissioner, Social Security Administration

*Defendant - Appellee*

_____

Appeal from United States District Court
for the District of Minnesota - Minneapolis

_____

Submitted: April 19, 2019
Filed: July 26, 2019

_____

Before COLLOTON, GRUENDER, and ERICKSON, Circuit Judges.

_____

GRUENDER, Circuit Judge.

The Social Security Commissioner denied Robert Dols's application for supplemental security income. After the Commissioner issued a final decision, Dols

---

[1]Andrew Saul became the Commissioner of Social Security on June 17, 2019 and has been automatically substituted as a party pursuant to Federal Rule of Appellate Procedure 43(c)(2).

filed a complaint in the district court,[2] which granted the Commissioner's motion for summary judgment. We affirm.

Dols applied for supplemental security income in September 2013. After the claim was initially denied and denied again upon reconsideration, an administrative law judge ("ALJ") held a hearing. Dols; Dr. Michael Lace, a psychological expert; Nancy Kaley, Dols's counselor; and a vocational expert testified at the hearing. The ALJ issued a decision on September 2, 2015 using the five-step process outlined by 20 C.F.R. § 416.920(a) for evaluating disability. At step two, the ALJ determined that Dols "has the following severe impairments: anxiety, depression, Asperger's disorder, cerebral dysfunction, obsessive compulsive disorder and [a] history of substance abuse/dependence." At step three, the ALJ concluded that Dols's impairments did not meet or medically equal "the severity of one of the listed impairments." The ALJ denied Dols benefits, giving great weight to Dr. Lace's opinion and no weight to Kaley's opinion. The Appeals Council denied Dols's request for review, and the ALJ's decision became the Commissioner's final decision.

In granting summary judgment, the district court determined that substantial evidence supported both the ALJ's conclusion that Dols did not meet or equal a listed impairment and the ALJ's decision to give great weight to Dr. Lace's opinion. On appeal, Dols argues that his severe impairments meet listings 12.02, 12.04, 12.06, and 12.10. *See* 20 C.F.R. pt. 404, sbpt. P, app. 1 (2013). He also argues that the ALJ improperly "accorded great weight" to Dr. Lace's opinion and that Kaley's opinion should have been given more weight than Dr. Lace's.

---

[2]The Honorable Tony N. Leung, Magistrate Judge, United States District Court for the District of Minnesota, to whom the case was referred by consent of the parties pursuant to 28 U.S.C. § 636(c).

"We review the district court's determination *de novo*, affirming the ALJ's decision if it is supported by substantial evidence on the record as a whole." *Scott v. Berryhill*, 855 F.3d 853, 856 (8th Cir. 2017) (internal quotation marks omitted). We must consider "the evidence that supports the Commissioner's decision as well as the evidence that detracts from it. That we would have come to a different conclusion, however, is not a sufficient basis for reversal." *Finch v. Astrue*, 547 F.3d 933, 935 (8th Cir. 2008) (citation omitted). "If, after reviewing the record, the court finds it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the court must affirm the ALJ's decision." *Goff v. Barnhart*, 421 F.3d 785, 789 (8th Cir. 2005). "In conducting our limited and deferential review of the final agency determination under the substantial-evidence standard, we must view the record in the light most favorable to that determination." *Chismarich v. Berryhill*, 888 F.3d 978, 980 (8th Cir. 2018) (per curiam).

At step two of the five-step process, the ALJ considers "the medical severity of [the claimant's] impairment(s)." 20 C.F.R. § 416.920(a)(4)(ii). At step three, "[i]f the impairment meets or equals one of the listed impairments [in 20 C.F.R. pt. 404, subpt. P, app. 1], the claimant is conclusively presumed to be disabled." *Bowen v. Yuckert*, 482 U.S. 137, 141 (1987). "To meet a listing, a claimant must show that he or she meets all of the criteria for the listed impairment." *Blackburn v. Colvin*, 761 F.3d 853, 858 (8th Cir. 2014).

At the time of the ALJ's decision, listings 12.02, 12.04, and 12.06 required that a claimant meet the paragraph A and B criteria or the paragraph A and C criteria. 20 C.F.R. pt. 404, sbpt. P, app. 1, § 12.00 (2013). Listing 12.10 required that a claimant meet both the paragraph A and paragraph B criteria. *Id*. § 12.10. We assume, without deciding, that the paragraph A criteria have been satisfied for all the listings at issue. Thus, Dols may meet one of the listings by satisfying the paragraph B or the paragraph C criteria. We consider paragraph B first.

All four listings have the same paragraph B, which is satisfied when the claimant proves two of four criteria. *See Id.* §§ 12.02(B), 12.04(B), 12.06(B), 12.10(B) (2013). The ALJ determined that Dols did not prove any of the four. Because Dols appeals the ALJ's determination as to only the first two criteria, Dols must succeed on both arguments. Thus, Dols must first show that substantial evidence does not support the ALJ's determination that Dols failed to prove the first criteria because he has a moderate rather than a marked restriction on his activities of daily living ("ADLs"). *Id*.

ADLs "include adaptive activities such as cleaning, shopping, cooking, taking public transportation, paying bills, maintaining a residence, caring appropriately for . . . grooming and hygiene, using telephones and directories, and using a post office." *Id*. § 12.00(C)(1) (2013). The Code of Federal Regulations requires an assessment of "the quality of these activities by their independence, appropriateness, effectiveness and sustainability" and a determination of "the extent to which [the claimant is] capable of initiating and participating in activities independent of supervision or direction." *Id*.

In support of its determination, the ALJ noted that the testifying psychological expert, Dr. Lace, "opined moderate limits." It also noted that Dols "indicated in his November 2013 function report that he had no problems performing personal cares such as bathing or dressing himself"; that "[h]e performs yard work around the sober house he resides at"; "prepares meals and cleans his house"; rakes and mows the lawn; washes laundry; "shops for groceries and some personal items"; that he "can count change, pay bills, use a checkbook or money orders and a savings account"; and that he was working part-time.

Dols argues that the ALJ should not have relied on Dols's statements in his function report because accepting the "statements at face value in the paragraph B analysis was at odds with the ALJ's own credibility determination." During the

ALJ's step three analysis, it was required to determine Dols's residual functional capacity ("RFC"). 20 C.F.R. § 416.920(e). In doing so, the ALJ must assess the claimant's "ability to meet the physical, mental, sensory, and other requirements of work." *Id*. § 416.945(a)(4). The ALJ noted that Dols's and Kaley's statements "concerning the intensity, persistence and limiting effects of [Dols's] symptoms [were] not credible to the extent they [were] not consistent with the objective medical evidence and other evidence." Dols claims that the ALJ cannot "have it both ways." He argues that the ALJ could not base its paragraph B findings on Dols's statements while simultaneously finding his statements not credible for the RFC assessment.

But the RFC assessment requires consideration of "all of the relevant medical and other evidence." *Id*. § 416.945(a)(3). In contrast, the ALJ looked to the function report for an account of Dols's daily life. The ALJ found Dols's statements not credible for the RFC assessment only to the extent that they conflicted with medical evidence and other evidence. It was reasonable for the ALJ to conclude that Dols could reliably describe his daily life but that Dols's opinion about "physical and mental limitations" that would affect what work he could do in a work setting was not credible. *Id*. § 416.945(a)(1).

In addition, Dols argues that the ALJ's finding is not supported by substantial evidence because Kaley's testimony demonstrates that he "has serious difficulties in performing his ADLs without the significant supervision and oversight of the Five Stars residential facility where he lives." Kaley testified before the ALJ that Dols could drive and grocery shop but that he "would need help with his money." She explained that staff at the residential facility review his grocery list every two weeks and make sure that he does not run out of his medications. Dols also points to the fact that the staff at the residential facility meet with him three times a week.

While Dols has some help with managing money and grocery shopping, he also appears to have done those tasks on his own at times. Further, Dols testified that he

cleans dishes and bathrooms, sweeps and vacuums the house, and reads the newspaper and magazines. A licensed psychologist who examined Dols noted that he arrived early for their meeting and that he had "arranged a ride." She also observed that he was "casually dressed and adequately groomed." At the time of the hearing before the ALJ, Dols had recently worked as a janitor. And Kaley testified that Dols had biked to a movie.

Given that Dols bears the burden of proving a disability at step three, we conclude that substantial evidence supports the ALJ's determination that Dols has only a moderate restriction on his ADLs. *See Blackburn*, 761 F.3d at 858 (explaining that the claimant "bears the burden of establishing that he meets all the criteria"). "It is not the role of this court to reweigh the evidence presented to the ALJ or to try the issue in this case de novo." *Cox v. Astrue*, 495 F.3d 614, 617 (8th Cir. 2007). Thus, substantial evidence supports the ALJ's decision that Dols does not meet the paragraph B requirements, and he therefore does not meet listing 12.10, which requires claimants to satisfy both the paragraph A and the paragraph B criteria, or listings 12.02, 12.04, or 12.06 on the basis of paragraph B. 20 C.F.R. pt. 404, sbpt. P, app. 1, §§ 12.02, 12.04, 12.06, 12.10 (2013).

While Dols has not shown that he meets paragraph B, he may still meet listings 12.02 and 12.04[3] if he shows that he meets paragraph C. *Id*. § 12.00 (2013). He argues that he satisfies paragraph C's third criterion, which requires him to show that a "chronic organic mental disorder" (§ 12.02) or a "chronic affective disorder" (§ 12.04) caused a "[c]urrent history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement." *Id*. §§ 12.02(C), 12.04(C) (2013). "The regulations define highly

---

[3]While Dols argues on appeal that he satisfies the 12.02 and 12.04 paragraph C requirements, he concedes that he does not meet listing 12.06's different paragraph C criteria.

supportive settings to include hospitals, halfway houses, care facilities, and personal home settings that greatly reduce the mental demands placed on [the claimant]." *Myers v. Colvin*, 721 F.3d 521, 526 (8th Cir. 2013) (alteration in original and internal quotation marks omitted).

The ALJ concluded that Dols failed to meet the paragraph C criteria. It acknowledged that Dols "currently resides in sober housing" and that he had previously "resided with his parents." But the ALJ pointed out that the record "shows that [Dols] was the primary caretaker for his mother after his father passed away." It determined that the "record does not support a finding that [Dols] is required to live in residential housing due to his mental impairments when not using mood-altering substances."

At the hearing, Kaley testified that Dols had been living at Five Stars for three years. Dols argues that he has met the paragraph C criteria because the support he receives at Five Stars "includes group and individual therapy sessions, facilitated attendance at Alcoholics Anonymous meetings, oversight of [his] budget, medications, and grocery delivery order, and general oversight of [his] daily affairs."

The district court concluded that the evidence indicates Dols may need a supportive living arrangement, but it emphasized that paragraph C requires Dols to demonstrate his need for a *highly* supportive living arrangement. We agree with the district court that substantial evidence supported the ALJ's conclusion that Dols has not made such a showing here. Though one psychologist stated that Dols "could be considered for future placement in a semi-independent or shared-living facility with on-site supports," his recommendation did not indicate that Dols needs a highly supportive living arrangement. Indeed, as outlined above, Dols has worked part-time, completes a number of chores around Five Stars, prepares food for himself, and sometimes shops for his own groceries. The record also indicates that Dols lived on his own after moving out of his parents' home before he began living at Five Stars.

Further, Dols began living at Five Stars to participate in a relapse recovery program for his drug and alcohol addictions. He has maintained his sobriety since 2012. Five Stars was not intended to have permanent residents, but Five Stars allowed Dols to stay because he did not "have anywhere else to go and he can't work." But paragraph C requires that a chronic organic mental disorder or a chronic affective disorder caused the "inability to function outside a highly supportive living arrangement." 20 C.F.R. pt. 404, sbpt. P, app. 1, §§ 12.02(C), 12.04(C) (2013). Dols's alcohol and drug addictions caused his initial residence at Five Stars. And while Dols attends three meetings a week at Five Stars, the meetings are for his alcohol addiction, not for mental health treatment. Kaley testified that nobody at Five Stars is trained "to deal with populations that have the problems that [Dols] has." Even were we to assume that Five Stars is a highly supportive living environment, substantial evidence supports a conclusion that Dols has not shown that a chronic organic mental disorder or a chronic affective disorder caused his alleged need to stay at Five Stars. Thus, substantial evidence supports the ALJ's determination that Dols does not satisfy the paragraph C criteria.

Finally, Dols contests the weight the ALJ gave to Kaley's and Dr. Lace's opinions. He argues that it was unreasonable for the ALJ to give no weight to Kaley's opinion, that Dr. Lace's opinion should not have been given "great weight," and that Kaley's opinion should outweigh Dr. Lace's given her greater familiarity and relationship with Dols. As an initial matter, it is not clear that Dols challenged the ALJ's decision to give no weight to Kaley's opinion in the district court. *See Nasser v. Astrue*, 248 F. App'x 766, 768 (8th Cir. 2007) (per curiam) (declining to consider arguments raised for the first time on appeal). But even if we assume that Dols raised this argument, substantial evidence supports the ALJ's decision.

According to the Social Security Administration ("SSA") regulations, Kaley is a non-medical, "other" source. *See* 20 C.F.R. § 416.913(d) (2013); *Sloan v. Astrue*, 499 F.3d 883, 888 (8th Cir. 2007) (explaining that non-medical, "other sources"

-8-

include rehabilitation counselors). The regulations classify Dr. Lace, a psychological expert, as a medical source. The SSA provides similar factors for weighing both Kaley's and Dr. Lace's opinions, including the examining and treatment relationships, the length of the treatment, the nature and extent of the relationship, supportability, consistency with the record, specialization, and other factors that support or refute the opinion. *See* SSR 06-3p, 2006 WL 2329939, at *5 (Aug. 9, 2006) (explaining the factors for non-medical, other sources); 20 C.F.R. § 416.927(c) (2013) (explaining the factors for medical sources).

Kaley began counseling Dols in March 2012 and testified about Dols's life at Five Stars. She explained that Dols has Asperger's, that he "appears angry" when relating to others, does not make eye contact, "grunts when he gets tense," and "at times" gets Tourette's. She was "afraid" that his symptoms "would happen at a job site." It is not surprising that there is some evidence in a lengthy administrative record "which detracts from the Commissioner's determination" about what weight to give Kaley's opinion. *See Fentress v. Berryhill*, 854 F.3d 1016, 1021 (8th Cir. 2017). For example, Kaley knew and counseled Dols for a number of years, and others who interacted with Dols supported her observation that Dols has trouble communicating.

But we consider only whether the ALJ's decision is supported by substantial evidence, not whether we would have made the same decision. *See Travis v. Astrue*, 477 F.3d 1037, 1042 (8th Cir. 2007). And some of Kaley's testimony is contradicted or not supported by the record. While Kaley said Dols "got Tourette's," Dols does not cite anything in the record indicating that he was diagnosed with such a condition. Further, while Kaley testified that Dols could not hold a job, he had recently worked as a janitor with no performance problems. In general, Kaley presented little to no evidence other than her personal observations. Instead, she based her opinion about Dols's ability to work on her observations as a licensed alcohol and drug counselor, not as an expert with experience in making disability determinations. "[W]e must

-9-

view the record in the light most favorable to [the ALJ's] determination." *Chismarich*, 888 F.3d at 980.

By contrast, Dr. Lace testified as an expert in mental health, was familiar with the disability review process, and reviewed all of the evidence in the case. He testified that Dols's mental health problems did not meet or equal any of the listings. He said that certain work restrictions, like "no public contact at all," should apply to Dols. He explained that Dols should be "limited to very simple," routine, repetitive tasks and that he was best suited to low-stress work that does not include high-speed production tasks.

A review of the record as a whole supports Dr. Lace's testimony. After a phone interview with Dols in October 2013, an SSA employee indicated that Dols had no difficulty with understanding, coherency, concentrating, talking, or answering questions. Though one psychologist observed "poor communication skills, [a] lack of social relationships, poor eye contact, and [a] vocal tic" in February 2014, a different psychologist noted that Dols was "relaxed, casual, cooperative, [and] appropriate," and that Dols was "not depressed" and "not anxious" after four meetings from July 2014 to April 2015. The psychologist additionally observed that Dols's speech was coherent with a normal rate and tone and that Dols's judgment and insight were intact. The psychologist made the same observations following July and October 2015 meetings with Dols.

This evidence supports Dr. Lace's opinion and contradicts Kaley's opinion. *See* SSR 06-3p, 2006 WL 2329939, at *6 (explaining that evidence from a non-medical, other source could outweigh evidence from a medical source when the non-medical source "has seen the individual more often and has greater knowledge of the individual's functioning over time" and if the opinion "*has better supporting evidence and is more consistent with the evidence as a whole*" (emphasis added)). To the extent that the Vineland II test measuring adaptive skills and other evidence

-10-

in the record conflicts with Dr. Lace's opinion, we agree with the district court that the ALJ's decision was within the "zone of choice."[4]  *See Travis v. Astrue*, 477 F.3d at 1042.

In sum, while the ALJ could have weighed the evidence differently, substantial evidence supports the ALJ's determination that Dr. Lace's review of all the evidence should be credited over Kaley's observations as a non-medical, other source.  "It is the function of the ALJ to weigh conflicting evidence."  *Kirby v. Astrue*, 500 F.3d 705, 709 (8th Cir. 2007).  We "will not reverse merely because evidence also points to an alternate outcome."  *Travis*, 477 F.3d at 1042.

For the foregoing reasons, we affirm.

ERICKSON, Circuit Judge, dissenting.

The parent of a disabled child who goes to any length to support and assist the child in ways that allow the child to be as fully integrated in society as possible rejoices in the child's success.  That same parent worries about what will happen to the child after he or she is gone, fearful that the system will fail the child and leave him or her mostly defenseless in a world that little recognizes mental illness and the hurdles it lays before those who suffer.  This case is a case in which those parental fears have been realized.  And I respectfully dissent.

---

[4]Dols further argues that the ALJ should not have given Dr. Lace's opinion great weight because Dr. Lace testified that his opinion was based on the record and that he did not consider Kaley's testimony.  Dols claims that the SSA's Hearings, Appeals, and Litigation Law Manual  ("HALLEX") required Dr. Lace to have considered Kaley's testimony.  Even if HALLEX did impose such a requirement, it "is not a regulation.  It has no legal force, and it does not bind the SSA."  *See Schweiker v. Hansen*, 450 U.S. 785, 789 (1981) (per curiam).

Robert Dols faces many significant mental health challenges. He is 62 years old and suffers from, among other things, depression, anxiety, alcohol dependence, and autism-spectrum disorder. His intellectual functioning falls in the low-average range, but his memory is not as good as one would expect of a person with his IQ. As a result of his mental health issues, Robert struggles to interact appropriately with others. He is easily frustrated and engages in conduct that is generally considered by others to be unusual and avoidant. He lacks sufficient insight to see most, if any, of these limitations in himself. The record reflects that, while in conversation with others, Robert scowls, grunts, squeals, avoids eye contact, is unable to track the conversation, and is unable to appropriately answer questions put to him. Robert sometimes shouts out vulgarities or makes odd guttural noises when anxious, particularly in group settings. Robert reports that he is sometimes asked to leave a job after a single day. No one has been able to identify that Robert has ever had a close friend. Robert lived with his parents until he was nearly fifty years old—only becoming independent when his mother was placed in a nursing home.

While living at home with both of his parents, Robert was able to maintain sustained full-time employment with the assistance and support of his parents. When his father died in 2004, Robert quit his job to assist his mother. In 2006, Robert's mother was placed in a nursing home, and he moved into an apartment. Since then, Robert has been unable to hold a job, has suffered from alcoholism, and was homeless for a time. He now lives in an alcohol-related group home, even though he no longer meets the requirements to reside there.

I recognize that some conflict exists in the record as to the nature and extent of Robert's social limitations. But, because the ALJ failed to provide "good reasons" for rejecting Robert's primary counselor's opinion, I would reverse and remand to the district court with instructions to remand to the ALJ for reconsideration of Robert's application after giving the counselor's opinion proper weight.

-12-

The ALJ assigned "great weight" to the opinion of Dr. Lace, who conducted a review of the record and testified as a consulting physician. The ALJ, however, gave "no weight" to the opinion of Robert's "primary counselor" in the intensive outpatient program, Nancy Kaley. The ALJ found Kaley's testimony about the "intensity, persistence and limiting effects of [Robert's] symptoms" to be "not credible" because of the inconsistency with (1) Dr. Lace's opinion, (2) "observations by medical providers," and (3) Robert's activities of daily living (ADLs). The record does not support the ALJ's credibility assessment.

In assessing whether a claimant is disabled for the purposes of Social Security benefits eligibility, an ALJ must consider evidence provided by "other sources" like Kaley. Lawson v. Colvin, 807 F.3d 962, 967 (8th Cir. 2015). When an ALJ discounts evidence based on a perceived lack of credibility, "[w]e 'do not reweigh the evidence presented to the ALJ'" but rather defer to the ALJ's credibility determinations "as long as those determinations are supported by good reasons and substantial evidence." Midgyett v. Comm'r, Soc. Sec. Admin., 727 F. App'x 228, 229 (8th Cir. 2018) (quoting Johnson v. Colvin, 788 F.3d 870, 872 (8th Cir. 2015)). Kaley's opinion is neither inconsistent with medical provider observations nor Robert's ADLs.

Kaley testified that Robert does not know how to interact with or relate to others and needs help to communicate with others. She testified that he gets "agitated and nervous" when required to interact with others, "does not respond appropriately to conversation," and "does everything by himself." She described "his pattern of relating to others" to include angry facial expressions, avoidance of eye contact, sudden profane outbursts, tics, grunts and roars, and an inability to understand humor. Kaley identified these behaviors as the primary obstacle to Robert's employment. She found notable "deficits in terms of fending for himself." Kaley opined that Robert "wouldn't make it [living by himself]" because "he doesn't know how to

interact with people. He can't hold a job, he can't." She testified that he would be homeless if he did not reside in a supportive environment.

Consistent with Kaley's testimony, Dr. Lace testified that Robert's "anxiety and Asperger's symptoms" would allow only "very brief and very superficial and very infrequent contact with supervisors and coworkers" and zero contact with the public. "[H]e would work best on his own with . . . very limited contact with other people except for supervisors." Dr. Lace further testified that an adaptive skills test measured Robert's socialization to be "very low" and worse than a random sampling of 100,000 people, his adaptive behavior to be unexpected for someone of average intelligence, and his communication to be only better than one out of 10,000 randomly selected people.

"[T]he opinions of non-examining, consulting physicians" by themselves are not "substantial evidence." Harvey v. Barnhart, 368 F.3d 1013, 1016 (8th Cir. 2004). Instead, the Social Security Administration directs an ALJ to consider the same set of factors for weighing a non-medical opinion like that of Kaley as a medical opinion like that of Dr. Lace. See 20 C.F.R. § 404.1527(c), (f)(1). An ALJ is to consider: (1) the type of relationship between the source and the claimant, (2) the length of relationship, (3) the frequency of examination, (4) the nature and extent of the relationship, (5) the opinion's supportability with objective medical evidence, (6) the opinion's consistency with the record, (7) the source's area of specialty, and (8) "anyfactors . . . which tend to support or contradict the medical opinion." Id. § 404.1527(c). An ALJ must consider "all" of these factors. See id. The Administration acknowledges that factors such as seeing the claimant more often or providing better supporting evidence or a better explanation may lead to the conclusion that a non-medical opinion outweighs a medical opinion—and even an opinion from a treating source. See id. § 404.1527(f)(1).

The ALJ relied on two of these factors to weigh the opinions of Kaley and Dr. Lace—consistency with the record and their respective areas of speciality. Of course, one opinion may be credited over another when supported by better or more thorough evidence. See Wagner v. Astrue, 499 F.3d 842, 849 (8th Cir. 2007). But, the evidence cited in support of Dr. Lace's opinion—his "expertise in mental health, familiarity with the disability review process and his ability to review all of the evidence"—is not better. Other factors such as the length, nature, and extent of Robert's relationship with Kaley are particularly relevant here—none of which was addressed in the ALJ's decision. Kaley worked with Robert as his primary counselor for three and a half years. Her testimony reveals a high degree of familiarity with Robert. She knows his daily habits, routines, and quirks. She knows how he interacts with others because she routinely observes him in social settings like the common area and group therapy sessions. She described his specific behavior and its consequences in a variety of social settings.

The ALJ acknowledged that Dr. Lace could not provide "the kinds of conclusions that you could reach only if you were a treating source" and that the scope of Dr. Lace's testimony was limited because he never examined or treated Robert. Even so, the ALJ gave Kaley's testimony no weight. The Administration recognizes the importance of opinions from those most familiar with the claimant—a reason controlling weight is generally given to medical opinions from treating sources. They tend to be the ones "most able to provide a detailed, longitudinal picture of [a claimant's] medical impairment(s)" and to provide a "unique perspective" of the record otherwise unavailable from "objective medical findings alone or from reports of individual examinations, such as consultative examinations." 20 C.F.R. § 404.1527(c)(2). Although Kaley may not be a medical source, her unique relationship with Robert provides a detailed, longitudinal picture of his daily social functioning that is unavailable from the record evidence.

-15-

The ALJ pointed to "[c]linical observations" as support for Robert's ability to "perform full-time work within the mental parameters of the [RFC]." But, those observations are inconsistent. During a phone call with an administration employee, Robert demonstrated an ability to understand, concentrate, speak coherently, and answer questions. At an in-person appointment, however, he demonstrated poor communication and eye contact, lack of social relationships, and a vocal tic while meeting with a psychologist. Although the resolution of "conflicting evidence is within the province of the ALJ," Brachtel v. Apfel, 132 F.3d 417, 420 (8th Cir. 1997), an ALJ may not discount opinions from "other sources" like Kaley just because the evidence is mixed, see 20 C.F.R. § 404.1527(f)(1).

A review of the record reveals that Kaley's opinion is not inconsistent with the observations as a whole. She testified that part of what impedes Robert's full-time employment is the volatility of his social reactions. She testified that his triggers are hard to predict. She described instances when his behavior has "escalated" in response to "certain personalit[ies]," new environments or people, or disruptions in his routine. During times when he is agitated and nervous, Robert shouts more and rolls his fingers more.

By focusing on observations of Robert's affect, the ALJ discounted objective medical evidence produced during the visits. For example, the ALJ noted Robert's "cooperative and polite" affect at a 2013 evaluation, but the evaluation opined that Robert's employment prospects were, at best, "marginal . . . in positions that do not place much emphasis on social maturity and sustained interactions with others."

With regard to Robert's ADLs, we have "repeatedly observed that the ability to do activities such as light housework and visiting with friends provides little or no support for the finding that a claimant can perform full-time competitive work." Halverson v. Astrue, 600 F.3d 922, 932 (8th Cir. 2010) (internal quotation marks omitted) (quoting Reed v. Barnhart, 399 F.3d 917, 923-24 (8th Cir. 2005)). And even

-16-

if conflicting ADLs are sometimes a good reason to discount testimony, Robert's ADLs do not conflict with Kaley's opinion. The ALJ indicated that, despite Robert's reported "problems with social interactions," he takes baths, gets dressed, does chores, reads magazines, prepares meals, rides his bike, goes to movies, goes shopping, attends mandatory weekly meetings, and arranged a ride to a medical appointment on at least one occasion. Kaley testified that these activities are infrequent. Robert attended one movie by himself over the course of approximately two years. That Robert occasionally engages in solitary activities—or even a one-time conversation to arrange a ride—does not establish that he has the social skills necessary to maintain full-time employment. In fact, there is substantial evidence in the record to the contrary.

Similar to the clinical observations, Robert's ADLs also paint a mixed picture of his abilities. For example, after Robert arranged the ride, he exhibited behavior at the appointment that aligns with Kaley's testimony. "He was frowning/scowling the entire appointment" and "related in a rather odd manner." He talked "to himself under his breath, he had a grunting type vocal tic and he presented as if he was agitated."

Finally, the ALJ's conclusion that Kaley's opinion was not substantiated by "other evidence" is not supported by the record. Robert's employment history clearly shows his inability to maintain full-time work without support. He has held two full-time jobs in his 62 years of life—one for eight years and one for seven—both exclusively while he lived at home with his parents. Even though Robert voluntarily quit a part-time janitorial job sometime shortly before the hearing, that job is hardly evidence of Robert's ability to maintain full-time employment in a competitive environment. He worked "maybe twice a month, once every two weeks, and on a part time basis making $8 an hour." Without the support and assistance of his parents, Robert has been unable to maintain a full-time job.

-17-

In closing, I fear the majority's decision reflects an increasing tendency to "rubber stamp" an ALJ's action in contravention of the "scrutinizing analysis" our precedent requires. See Cline v. Colvin, 771 F.3d 1098, 1106 (8th Cir. 2014) (Bright, J., dissenting); Cooper v. Sec'y of Health & Human Servs., 919 F.2d 1317, 1320 (8th Cir. 1990). The ALJ's rejection of Kaley's testimony was error when viewed in light of the record as a whole. I believe the ALJ failed to provide "good reasons" for rejecting Kaley's testimony, and that error is not harmless. I would reverse and remand to the district court with instructions to remand to the ALJ for reconsideration of Robert's claim after giving Kaley's opinion proper weight.

_____